# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | |
|---|---|
| SPRING W., <br><br> Plaintiff, <br><br> v. <br><br> ANDREW M. SAUL, <br> Commissioner of Social Security, <br><br> Defendant. | Case No. 20 C 1864 <br><br> Magistrate Judge Sunil R. Harjani |

## MEMORANDUM OPINION AND ORDER

Plaintiff Spring W.[1] seeks judicial review of the final decision of the Commissioner of Social Security finding her ineligible for Supplemental Security Income Benefits under the Social Security Act. The Commissioner has moved for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure. For the following reasons, the Commissioner's motion [18] is granted, and the ALJ's decision is affirmed.

## BACKGROUND

Spring was working as a home care worker until March 2016, when Spring claims her conditions stopped her from working. (R. 193-94). The medical record shows that Spring suffered, at times, from depression, rheumatoid arthritis, and asthma. *Id.* at 272, 360. Her treatment for those conditions included office visits, the obtaining of medical imaging, and prescription medications, such as albuterol, flagyl, flonase, paroxetine, and tramadol. *Id.* at 267, 360.

Spring filed for a period of Supplemental Security Income Benefits on September 16, 2016, alleging disability beginning March 1, 2016. (R. 171). Spring's claim was initially denied on

---

[1] Pursuant to Northern District of Illinois Internal Operating Procedure 22, the Court refers to Plaintiff by her first name and the first initial of her last name or alternatively, by first name.

January 9, 2017, and upon reconsideration on May 10, 2017. *Id.* at 84, 94. Upon Spring's written request for a hearing, she appeared and testified at a hearing held on July 25, 2018 before ALJ Margaret Carey. *Id.* at 30-73. At the hearing, the ALJ heard testimony from Spring and a vocational expert, Thomas Dunlavey. *Id.*

On January 25, 2019, the ALJ issued a decision denying Spring's SSI claim. (R. 13-25). Following the five-step sequential analysis, the ALJ found that Spring had not engaged in substantial gainful activity since August 31, 2016, the application date[2] (step 1), and that she suffered from the severe impairments of asthma and depressive order (step 2). *Id*. at 15-16. The ALJ then determined that Shelia's impairments did not meet or equal the severity of a list impairment (step 3). *Id*. at 16-18.

The ALJ next concluded that Spring retained the residual functional capacity ("RFC") to perform medium work as defined in 20 CFR 416.967(c):

> More specifically, the claimant can lift and/or carry 50 pounds occasionally and 25 pounds frequently, with sitting for 6 hours and standing/walking for 6 hours and pushing/pulling as much as lifting and carrying. The claimant should never climb ladders, ropes, and scaffolds; and can frequently balance, stoop, and crouch. She should avoid exposure to unprotected heights and hazardous machinery. She can tolerate only occasional exposure to odors, dust, fumes, gases, and other pulmonary irritants. The claimant retains the ability to understand, remember, concentrate, persist, and perform simple routine repetitive tasks in a low-stress environment, defined as having few if any changes in the work setting and few if any work-related decisions. She should have no interaction with the public and superficial interaction with coworkers.

(R. 18). The ALJ next determined, given this RFC, that Spring was not capable of performing her past relevant work as a fast food worker or companion (step 4). *Id.* at 23-24. The ALJ then found that there were jobs that exist in significant numbers in the national economy that Spring could

---

[2] The record shows that Spring applied for SSI on September 16, 2016. (R. 171).

2

perform (step 5). *Id.* at 24-25. Specifically, the ALJ found that Spring could perform the jobs of laundry laborer, warehouse worker, and conveyor off-bearer. *Id.* at 24-25. Because of this determination, the ALJ found that Spring was not disabled. *Id*. at 25. The Appeals Council denied Spring's request for review on January 28, 2020, leaving the ALJ's decision as the final decision of the Commissioner. *Id.* at 1-3; *McHenry v. Berryhill*, 911 F.3d 866, 871 (7th Cir. 2018).

## DISCUSSION

Under the Social Security Act, a person is disabled if she is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). To determine disability within the meaning of the Social Security Act, the ALJ conducts a sequential five-step inquiry, asking: (1) Is the claimant presently unemployed? (2) Does the claimant have a severe impairment? (3) Does the claimant's impairment meet or equal an impairment specifically listed in the regulations? (4) Is the claimant unable to perform a former occupation? and (5) Is the claimant unable to perform any other work in the national economy? *Young v. Sec'y of Health & Human Servs.*, 957 F.2d 386, 389 (7th Cir. 1992); *Zalewski v. Heckler*, 760 F.2d 160, 162 n.2 (7th Cir. 1985); 20 C.F.R. § 416.920(a)(4). "An affirmative answer leads either to the next step, or, on steps 3 and 5, to a finding that the claimant is disabled. A negative answer at any point, other than step 3, ends the inquiry and leads to a determination that a claimant is not disabled." *Zalewski*, 760 F.2d at 162 n.2.

Judicial review of the ALJ's decision is limited to determining whether it adequately discusses the issues and is based upon substantial evidence and the proper legal criteria. *See Villano v. Astrue*, 556 F.3d 558, 562 (7th Cir. 2009); *Scheck v. Barnhart*, 357 F.3d 697, 699 (7th

Cir. 2004). Substantial evidence "means—and means only—'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Biestek v. Berryhill*, 139 S.Ct. 1148, 1154 (2019) (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)). In reviewing an ALJ's decision, the Court may not "reweigh the evidence, resolve conflicts, decide questions of credibility, or substitute [its] own judgment for that of the" ALJ. *Burmester v. Berryhill*, 920 F.3d 507, 510 (7th Cir. 2019). Although the Court reviews the ALJ's decision deferentially, the ALJ must nevertheless "build an accurate and logical bridge" between the evidence and her conclusions. *See Steele v. Barnhart*, 290 F.3d 936, 938, 941 (7th Cir. 2002) (internal citation and quotations omitted); *see also Fisher v. Berryhill*, 760 Fed. Appx. 471, 476 (7th Cir. 2019) (explaining that the "substantial evidence" standard requires the building of "a logical and accurate bridge between the evidence and conclusion"). Moreover, when the ALJ's "decision lacks evidentiary support or is so poorly articulated as to prevent meaningful review, the case must be remanded." *Steele*, 290 F.3d at 940.

Spring raises three arguments in support of her request for reversal: (1) the ALJ erred in rejecting Dr. Amdur's report; (2) the ALJ failed to accommodate Spring's moderate limitations in concentration, persistence, and pace; and (3) the ALJ erroneously found Spring's rheumatoid arthritis to be non-severe. Doc. [17]. The Court affirms the ALJ's decision because her findings are supported by substantial evidence. As the Supreme Court recently stated, "whatever the meaning of 'substantial' in other contexts, the threshold for such evidentiary sufficiency is not high. Substantial evidence, this Court has said, is 'more than a mere scintilla.'" *Biestek*, 139 S. Ct. at 1154. Here, the ALJ has sufficiently supported her conclusion with evidence, which evidence is definitely more than a mere scintilla, the Court can follow the ALJ's analysis in conducting a meaningful review, and a reasonable mind could accept the conclusion reached. Thus, this Court

4

cannot and does not reweigh the evidence or substitute its own judgment for that of the ALJ. Accordingly, for the reasons stated below, remand is not appropriate.

A.     **Rejection of Dr. Amdur's Report**

In May 2017, Spring presented to Dr. Mark Amdur for a psychiatric evaluation at the behest of Spring's counsel. (R. 334). Dr. Amdur interviewed Spring for over an hour but did not review any medical evidence. *Id.* Overall, Dr. Amdur found that Spring had a "striking interview presentation and display of behavioral symptoms during the interview." *Id.* at 339. He concluded that Spring "was unable to tolerate the stress of a diagnostic interview" and that "she would be unable to tolerate work stress [or] interact effectively and safely with coworkers and supervisors." *Id.* In his list of "Psychiatric Diagnoses," Dr. Amdur included obsessive-compulsive disorder with anxiety and affective instability, somatic symptom disorder, and possible intellectual disability. *Id.*

The ALJ accorded "little weight" to Dr. Amdur's opinion, finding it to be not supported and inconsistent with the record. *Id.* at 21. Spring contends that the ALJ improperly rejected Dr. Amdur's psychiatric evaluation. Doc. [17] at 11-12.

Because Dr. Amdur examined Spring once but did not have an ongoing treatment relationship with her, Dr. Amdur is a "nontreating source." 20 C.F.R. § 416.902 (2017). Nontreating sources are not entitled to controlling weight in determining whether a claimant is disabled. *Simila v. Astrue*, 573 F.3d 503, 514 (7th Cir. 2009). In assessing a nontreating source's opinion, the ALJ "is required to determine the weight a nontreating physician's opinion deserves by examining how well [the doctor] supported and explained his opinion, whether his opinion is consistent with the record, whether [the doctor] is a specialist . . . and any other factor of which the ALJ is aware." *Id.* at 515 (citing 20 C.F.R. § 404.1527(d)(3)-(6)). An ALJ must also "build an accurate and logical bridge between the evidence and the result" in weighing medical opinions.

5

*See Lambert v. Berryhill*, 896 F.3d 768, 774 (7th Cir. 2018) (internal quotation marks and citations omitted).

Here, the ALJ's analysis of Dr. Amdur's opinion was sufficient. The ALJ initially acknowledged that Dr. Amdur was a medical doctor, and that he conducted a psychiatric evaluation, which suggests the ALJ considered Dr. Amdur's specialty. (R. 21). *See* 20 C.F.R. § 416.927(c)(5). The ALJ further discussed the consistency of Dr. Amdur's opinion with the record as a whole. *See* 20 C.F.R. § 416.927(c)(4) ("Generally, the more consistent a medical opinion is with the record as a whole, the more weight we will give to that medical opinion."). Specifically, the ALJ stated that Dr. Amdur's opinion was not supported by Spring's mental status examination findings; the ALJ had previously observed that Spring's mental health examinations were "unremarkable, with the claimant having either no complaints or only mild symptoms and the findings being normal." (R. 21 (citing *id.* at 269, 275, 280, 286, 314, 320, 326, 365, 377, 408)). *See Rice v. Barnhart*, 384 F.3d 363, 370 n.5 (7th Cir. 2004) ("[I]t is proper to read the ALJ's decision as a whole[.]"). The ALJ additionally reasoned that Dr. Amdur's opinion was inconsistent with substantial evidence in the record, including Spring's description of her impairments and daily activities. (R. 21). As discussed by the ALJ elsewhere in her decision, Spring reported getting along with others and dealing appropriately with authority. *Id.* at 17. The ALJ likewise reflected that Spring "engaged in a somewhat normal level of daily activity and interaction," in light of Spring's "independently managing personal care needs, preparing simple meals, completing light household chores, caring for her disabled son, shopping, using the computer, paying bills and managing funds, reading, occasional participating in social activities, using public transportation, watching TV, completing puzzles, playing games on her phone, dancing, and traveling alone." *Id.* at 22-23 (citing *id.* at 35-63, 200-211, 301-309, 334-39). Finally, the ALJ discounted Dr. Amdur's

opinion in light of the limited treatment evidenced in medical records from the relevant time period, observing that "[h]er depression was managed with medication and other mental status examinations were within normal limits." *Id.* at 21. The ALJ thus fulfilled her duty by considering the consistency of a nontreating source's opinion with the record as a whole and explaining the weight given to that opinion.

Spring argues that the ALJ failed to minimally articulate her reasons for discounting Dr. Amdur's opinion and that the ALJ failed to build the requisite accurate and logical bridge from the evidence to her conclusions. Doc. [17] at 11-12. In particular, Spring takes aim at the ALJ's daily activities reason for giving lesser weight to Dr. Amdur's psychiatric evaluation. *Id.* According to Spring, there is no inconsistency between Dr. Amdur's report and her daily activities because Spring "testified that she spends most of her time at home watching cartoons and with the exception of microwaving a few things and playing Candy Crush on her phone, she does very little and the household chores are done by her sister or her children." *Id.* at 11. While Spring did so testify, (*see* R. 49-57), she also communicated in a function report from September 2016 that she engaged in daily reading, television, music, puzzles, and games without any issues. *Id.* at 204. She also reported that she did not have any problems getting along with family, friends, neighbors, or others. *Id.* at 205. In addition, Spring wrote "good," in response to questions about how well she followed instructions and how well she gets along with authority figures. *Id.* at 205-06. Spring further reported that she had never been laid off or fired from a job because of problems getting along with people. *Id.* at 206. Spring's self-reported activities and abilities were inconsistent with Dr. Amdur's severe evaluation, which indicated Spring could not handle the stress of a job and could even become violent with coworkers. *Id.* at 339. The ALJ highlighted the daily activity inconsistency generally in her weighing of Dr. Amdur's opinion and more granularly in her

7

evaluation of the Paragraph B criteria and assessment of Spring's subjective symptom allegations. *Id.* at 17, 22-23. The Court can trace the ALJ's reasoning and Spring has not shown that the ALJ's weighing of Dr. Amdur's opinion rested on an inaccurate or illogical bridge.[3] The Court therefore finds no error in the ALJ's weighing of Dr. Amdur's opinion.

Spring also insists that the ALJ's conclusion that Dr. Amdur's opinion is inconsistent with the record as a whole is unsupported, due to Spring's GAF score of 40. Doc. [17] at 11-12. Yet the ALJ specifically considered, but gave little weight to, Spring's low GAF score, explaining:

> The GAF score given by Ms. Marquina was generally indicative of serious overall impairment. However, it is impossible to determine what type or types of limitations or abilities are contemplated by this practitioner's GAF. Further, a GAF rating may indicate problems that do not necessarily relate to the ability to hold a job; thus, standing alone without further explanation, the rating does not evidence an impairment seriously interfering with a claimant's ability to work.

(R. 21-22). Although Spring would have preferred for the ALJ to give greater weight to the GAF score, the ALJ did not do so. It is not for this Court to reweigh the evidence. Instead, it is sufficient that the ALJ considered the medical evidence and minimally articulated her analysis in a manner that the Court can follow. The ALJ did so here, and the Court therefore upholds the ALJ's weighing of Dr. Amdur's opinion.

---

[3] In her reply brief, Spring lists additional daily activities that she purports are consistent with Dr. Amdur's report. Doc. [20] at 2-3. Yet the ALJ considered Spring's testimony on her daily activities, as well as her adult function report and her consultative examination with Dr. Rafiq, in which Spring made statements about her daily activities. (*See* R. 16, 17, 22-23). While the Court might have weighed that evidence differently, or used different language to describe Spring's testimony—the ALJ stated that "caring for her disabled son" was one of Spring's daily activities after Spring testified that her son was a recent high school graduate with a learning disability—the Court may not "reweigh the evidence, resolve conflicts, decide questions of credibility, or substitute [its] own judgment for that of the" ALJ. *Burmester*, 920 F.3d at 510. Significantly, Spring has not attacked the ALJ's subjective symptom analysis in this case.

8

B.  **Moderate Limitations in Concentration, Persistence, and Pace and Interacting with Others**

The ALJ determined that Spring had moderate limitations in her ability to concentrate, persist, or maintain pace and moderate limitations in interacting with others. (R. 17). To account for those limitations, the ALJ crafted the following mental RFC: "The claimant retains the ability to understand, remember, concentrate, persist, and perform simple routine repetitive tasks in a low-stress environment, defined as having few if any changes in the work setting and few if any work-related decisions. She should have no interaction with the public and superficial interaction with coworkers." *Id.* at 18. As the ALJ explained, "With respect to the claimant's mental impairments, the undersigned has incorporated the claimant's paragraph B limitations in finding the claimant is limited to simple routine repetitive tasks in a low-stress environment with no contact with the general public and superficial interaction with coworkers." *Id.* at 23. The ALJ's chosen mental RFC reflected her second hypothetical to the vocational expert, in which the ALJ supposed an individual who "retains the ability to understand, remember, concentrate, persist and perform simple, routine, repetitive tasks in a low stress environment defined as having few if any changes in the work setting and few if any work related decisions, no interaction with the public and only superficial interaction with coworkers." *Id.* at 67. Spring argues that the ALJ failed to accommodate Spring's moderate limitations in concentration, persistence, and pace and in interacting with others. Doc. [17] at 12-13.

Both "'the hypothetical posed to the VE and the ALJ's RFC assessment must incorporate all of the claimant's limitations supported by the medical record,' including even moderate limitations in concentration, persistence, or pace." *Crump v. Saul*, 932 F.3d 567, 570 (7th Cir. 2019). "Though particular words need not be incanted, we cannot look at the *absence* of the phrase 'moderate difficulties with concentration, persistence, and pace' and feel confident this

limitation was properly incorporated in the RFC and in the hypothetical question." *Winsted v. Berryhill*, 923 F.3d 472, 477 (7th Cir. 2019) (emphasis in original). Generally, "employing terms like 'simple, repetitive tasks' on their own will not necessarily exclude from the VE's consideration those positions that present significant problems of concentration, persistence and pace, and thus, alone, are insufficient to present the claimant's limitations in this area." *Id*. (internal quotation marks and citations omitted). This is because the terms "simple, routine, and repetitive tasks" refer to "unskilled work," which the regulations define as work that can be learned by demonstration in less than 30 days, but "the speed at which work can be learned is unrelated to whether a person with mental impairments—i.e., difficulties maintaining concentration, persistence, or pace—can perform such work." *Lanigan v. Berryhill*, 865 F.3d 558, 565-66 (7th Cir. 2017) (citations omitted); *O'Connor-Spinner v. Astrue*, 627 F.3d 614, 620 (7th Cir. 2010) (citations omitted) ("The ability to stick with a given task over a sustained period is not the same as the ability to learn how to do tasks of a given complexity.").

Here, the ALJ's RFC and hypothetical to the VE incorporated the mental limitations supported by the medical record. Treatment records showed that Spring suffered from depression, and that she complained to a doctor at least once about concentration issues. (*See, e.g.*, R. 283, 342). The record additionally shows that stress could both exacerbate Spring's ailments and cause symptoms for Spring. *See, e.g.*, *id.* at 340, 347, 354. In terms of interacting with others, Spring's testimony, as well as her presentation to Dr. Amdur, reflected potential limitations. *Id.* at 60-63, 334-39. The ALJ accommodated these issues with concentration, stress, and engaging with others by reducing her work to simple, routine, and repetitive tasks in a low-stress environment, with few work-related decisions, and no interaction with the public and only superficial interaction with coworkers. *Id.* at 18. The ALJ did not simply employ terms like "simple, repetitive tasks," without

10

any further specification. *See O'Connor-Spinner*, 627 F.3d at 620. Instead, the ALJ used the very terms "concentrate" and "persist" in her hypothetical to the vocational expert and carefully tailored the RFC restrictions to accommodate Spring's record-supported CPP limitations, as well as her limitations in interacting with others and her sensitivity to stress. Accordingly, the ALJ's hypothetical to the VE communicated Spring's record-supported mental limitations and the ALJ incorporated those limitations into the RFC.

Spring faults the ALJ for not providing an RFC limitation on interaction with supervisors, but the ALJ did not find such a limitation supported by the record. Contrary to Spring's argument that the ALJ "provided no rationale for choosing to include no limitations with regard to interactions with supervisors," Doc. [17] at 12, the ALJ's decision shows that the ALJ considered evidence regarding Spring's inability to interact with supervisors and either rejected or gave little weight to such evidence. For instance, as discussed above, the ALJ explicitly considered Dr. Amdur's opinion that Spring "would be unable to interact effectively and safely with coworkers and supervisors," but gave little weight to the opinion due to its inconsistency with the record as a whole. (R. 21). The ALJ also discussed Spring's allegation that "she has difficulty . . . dealing appropriately with authority," in connection with her evaluation of the Paragraph B criteria. *Id.* at 17. The ALJ found that Spring had moderate limitations in interacting with others but did not find her allegation fully credible, explaining "according to her statements, the claimant is [] able to get along with others . . . [and] deal appropriately with authority[.]" *Id.* The ALJ further observed that Spring was "described as pleasant and cooperative, had good interactions with non-medical staff, and appeared comfortable during appointments." *Id.* Finally, the ALJ discounted Spring's testimony—which included statements about struggling with interacting with family members and others—in light of Spring's engagement "in a somewhat normal level of daily

11

activity and interaction." *Id.* at 22. From these discussions and the ALJ's chosen RFC, it is clear that the ALJ did not find a supervisor limitation to be warranted.[4]

Furthermore, this case is not like *DeCamp v. Berryhill*, the case relied upon by Spring. Doc. [17] at 12-13. In *DeCamp*, the ALJ relied on the mental RFC opinion of a state agency physician who found that the claimant would have limitations in "maintaining attention and concentration for extended periods; performing activities within a schedule, maintaining regular attendance, and being punctual within customary tolerances; working in coordination or proximity to others without being distracted; and completing a normal workday and workweek without interruptions from psychologically based symptoms and performing at a consistent pace." *DeCamp v. Berryhill*, 916 F.3d 671, 675 (7th Cir. 2019). Instead of mentioning these limitations in the hypothetical to the VE, the ALJ in *DeCamp* opted to limit the claimant to "unskilled work" with "no fast-paced production line or tandem tasks." *Id.* (internal quotation marks omitted). The court rejected the formulation, explaining that "there is no basis to suggest that eliminating jobs with strict production quotas or a fast pace may serve as a proxy for including a moderate limitation on concentration, persistence, and pace." *Id.* at 675-76 (citations omitted). The *DeCamp* Court also took issue with the ALJ's focus on the state agency physician's "bottom-line conclusion that [the claimant] was not precluded from working," without "giving the vocational expert any basis to evaluate *all* [of the claimant's] impairments, including those in concentration, persistence, and pace." *Id.* at 676 (emphasis in original).

---

[4] Spring points out that "[w]hen asked if there were any jobs for an individual who was unable to interact with supervisors the VE responded that there would not be[.]" Doc. [17] at 12. True, but asking the VE about a supervisor limitation is not the same as finding that the record supports a supervisor limitation. ALJs routinely ask vocational experts multiple hypothetical questions in developing the record. In the end, it is the chosen hypothetical incorporated into the RFC that matters, and it need only be supported by substantial evidence. *See Recha v. Saul*, 843 F. App'x 1 (7th Cir. 2021); *Clemente A. v. Saul*, No. 18 CV 6345, 2019 WL 3973117, at *5 (N.D. Ill. Aug. 22, 2019).

In this case, no state agency physician opined that Spring had problems with "maintaining attention and concentration" or "completing a normal workday and workweek without interruptions from psychologically based symptoms and performing at a consistent space." *DeCamp*, 916 F.3d at 675.[5] The only opinion support for greater limitations than those included by the ALJ was Dr. Amdur's, and the ALJ gave little weight to that opinion. (R. 21). The ALJ here further gave the VE a basis to evaluate all of the claimant's record-supported mental limitations by specifying a hypothetical individual who could understand, remember, concentrate, persist, and perform simple, routine, and repetitive tasks in a low-stress environment, and who could only interact with coworkers on a superficial basis. *Id.* at 18. As a result, the lack of record support for additional limitations, as well as the ALJ's communication of Spring's mental limitations to the VE, distinguish this case from *DeCamp*. Spring has failed to identify a reversible mental RFC error in this case.

C.     **Step Two Determination on Rheumatoid Arthritis**

Spring's final argument is that the ALJ should have found Spring's rheumatoid arthritis to be severe at step two. Doc. [17] at 14-15. According to Spring, the ALJ failed to apply the requisite *de minimis* standard for assessing the severity of a claimant's limitations. *Id.* at 15 (citing *Bowen v. Yuckert*, 107 S.Ct. 2287, 2297 (1987)).

"The evaluation of whether an impairment(s) is 'severe' that is done at step 2 of the applicable sequential evaluation process set out in 20 CFR 404.1520, 416.920, or 416.924 requires an assessment of the functionally limiting effects of an impairment(s) on an individual's ability to do basic work activities or, for an individual under age 18 claiming disability benefits under title XVI, to do age-appropriate activities." SSR 96–3p, 1996 WL 374181, at *1 (July 2, 1996).

---

[5] In a similar vein, no doctor opined that Spring would require an off-task time limitation, so Spring's argument that the ALJ should have included an off-task time limitation, lacks merit. *See* Doc. [20] at 3-4.

Generally, in order to find a severe impairment or combination of impairments in step two, the impairment(s) must significantly limit the claimant's physical or mental ability to perform basic work activities for at least twelve consecutive months. *See* 20 C.F.R. §§ 416.920(c) & 416.922(a). "An impairment or combination of impairments is found 'not severe' and a finding of 'not disabled' is made at [step two] when medical evidence establishes only a slight abnormality or a combination of slight abnormalities which would have no more than a minimal effect on an individual's ability to work even if the individual's age, education, or work experience were specifically considered (i.e., the person's impairment(s) has no more than a minimal effect on his or her physical or mental ability(ies) to perform basic work activities)." *Bowen v. Yuckert*, 482 U.S. 137, 154 n.12 (1987) (quoting SSR 85–28).

While Spring is correct that "[t]he severe impairment requirement is a *de minimis* requirement designed to weed out frivolous claims," *Thorps v. Astrue*, 873 F. Supp. 2d 995, 1004 (N.D. Ill. 2012) (citation omitted), the Court must nevertheless give deference to the ALJ's conclusions that are supported by substantial evidence. *Id.* In this case, the ALJ did not find Spring's rheumatoid arthritis to be a severe condition due to lack of record support. (R. 16). In particular, the ALJ observed that Spring's treatment records "indicate her physician was ruling out rheumatoid arthritis and that the claimant exhibited no signs of inflammatory arthritis[.]" *Id.* The ALJ also pointed to Spring's "subsequent x-rays of the claimant's hands and feet," which were "unremarkable, with no indication of arthritis." *Id.*[6] Because a "reasonable mind might accept" the ALJ's cited evidence as "adequate to support" her conclusion that rheumatoid arthritis was not

---

[6] Spring does not contend that the ALJ incorrectly characterized the treatment records. Instead, she directs the Court to medical records already considered by the ALJ in making her step two determination. Doc. [17] at 13-14. (*See* R. 16 (citing "Exhibits 1F, 2F, 5F, 6F, 7F, and 8F")). While Spring may have preferred the ALJ to weigh those records differently, the Court cannot reweigh them. *Gedatus v. Saul*, No. 20-1753, --- F.3d ----, 2021 WL 1589329, at *5 (7th Cir. Apr. 23, 2021) (citing *Burmester*, 920 F.3d at 510).

a severe condition of Spring's, the ALJ's step two determination is supported by substantial evidence. *Biestek*, 139 S.Ct. at 1154.

In any event, courts rarely find the failure to designate an impairment as severe to be harmful, as the step two finding is merely a threshold finding. So long as one impairment is named by the ALJ to be severe, the ALJ will move on and consider both the claimant's severe and non-severe impairments. *See, e.g., Arnett v. Astrue*, 676 F.3d 586, 591 (7th Cir. 2012) (citation omitted) (emphasis in original) (holding any error of omission in Step 2 harmless where ALJ categorized two impairments as severe, as "[d]eciding whether impairments are severe at Step 2 is a threshold issue only; an ALJ must continue on to the remaining steps of the evaluation process as long as there exists even *one* severe impairment").

Here, the ALJ found that Spring had the severe impairments of asthma and depressive order and therefore went on to consider the impact of Spring's severe and non-severe impairments. (R. 15-16, 18-23). That consideration can be seen in her discussion of Spring's testimony on her arthritis, as well as the ALJ's explanation that she restricted Spring to "jobs that do not involve climbing ladders, ropes, or scaffolds, and involve frequent balancing, stooping, and crouching, and crawling" to "further accommodate[] the claimant's physical impairments and her subjective complaints of joint pain." *Id.* at 18, 22, 23. Because the ALJ found some severe impairments and went on to consider Spring's impairments in her RFC analysis, any error in not naming rheumatoid arthritis as a severe limitation at step two was harmless.[7]

---

[7] The same is true for fibromyalgia, an impairment raised in Spring's reply brief. Doc. [20] at 5. Spring argues that "[t]he significance of the ALJ's failure to recognize Plaintiff's Rheumatoid arthritis and/or fibromyalgia as a severe impairment is that as result of that failure," the ALJ found Spring capable of medium work. *Id.* However, it is not the lack of a "severe impairment" label for rheumatoid arthritis or fibromyalgia that led to the ALJ's RFC decision. Rather, it is the ALJ's weighing of the medical opinions and treatment records, as well as the ALJ's assessment of Spring's testimony, which led to the medium RFC. Spring has not identified an error with respect to those supporting pieces, and her

Spring attempts to lump in a general RFC argument with her severe condition argument. *See* Doc. [17] at 13 (emphasis added) ("The ALJ Erred in Finding Plaintiff's Rheumatoid Arthritis To be Non-Severe *and she further Erred in find[ing] Plaintiff capable of a range of Medium work*."). However, Spring has not developed the medium work RFC argument, so it is waived. *Heather M. v. Berryhill*, 384 F. Supp. 3d 928, 934 (N.D. Ill. 2019).[8] So too is Spring's unsupported statement out of left field that "[t]he ALJ is not a physician and it is legal error for her to substitute her medical opinion for that of a physician." Doc. [17] at 14. Not only did Spring fail to cite any authority or explain how the ALJ improperly substituted her medical opinion here, but Spring also failed to include "playing doctor" as an issue for the Court to review. *See* Doc. [14]; *Cannon v. Teamsters & Chauffeurs Union, Loc. 627*, 657 F.2d 173, 177 (7th Cir. 1981) (interpreting Fed. R. App. P. 28).

In conclusion, Spring has failed to raise a reversible error in the ALJ's decision. She disagrees with the ALJ's weighing of Dr. Amdur's opinion, the chosen mental RFC, and the ALJ's failure to designate rheumatoid arthritis as a severe limitation. Yet, the record shows that the ALJ considered and weighed Dr. Amdur's opinion, tailored Spring's mental RFC to the limitations supported by the record, and provided adequate reasons for not designating rheumatoid arthritis as a severe condition. The ALJ, moreover, continued on to evaluate Spring's severe and non-severe impairments, despite her rheumatoid arthritis finding. Throughout her decision, the ALJ provided enough analysis for the Court to trace her reasoning, and Spring has not shown any inaccuracies

---

summary of treatment records already considered by the ALJ does not persuade the Court that there was an RFC error in this case. *See Gedatus*, 2021 WL 1589329, at *5.

[8] To the extent that Spring meant to develop her medium RFC argument with her discussion of treatment records concerning rheumatoid arthritis, *see* Doc. [20] at 4-5, those treatment records were already considered by the ALJ. (*See* R. 16 (citations omitted). As such, the Court will not reweigh the evidence, and Spring's RFC argument fails.

in that analysis. *See Steele*, 290 F.3d 936 at 941. It is not for this Court to "reweigh the evidence, resolve debatable evidentiary conflicts, determine credibility, or substitute our judgment for the ALJ's determination so long as substantial evidence supports it." *Gedatus*, 2021 WL 1589329, at *5. Here, the low threshold for substantial evidence was met, as a "reasonable mind might accept" the ALJ's cited evidence in this case as "adequate to support" her conclusions. *Gedatus*, 2021 WL 1589329, at *5 (quoting *Richardson v. Perales*, 402 U.S. 389, 401, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971)).

## **CONCLUSION**

For the reasons set forth above, the Commissioner's motion [18] is granted, and the ALJ's decision is affirmed.

**SO ORDERED.**

Dated: June 21, 2021

Sunil R. Harjani
United States Magistrate Judge